Docusign Envelope ID: D2233AEA-5969-4C83-B1BB-37AA4E50E1D

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED PARCEL SERVICE, INC., | |
| *Plaintiff*, | |
| v. | |
| OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION; U.S. DEPARTMENT OF LABOR; and, JULIE A. SU, in her official capacity as Acting Secretary of Labor, | C.A. No. 1:24-CV-01036-CFC |
| *Defendants*. | |

## <u>DECLARATION OF TAMMY WILSON IN SUPPORT OF PLAINTIFF UNTIED PARCEL SERVICE, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

I, Tammy Wilson, hereby state and declare as follows:

1.     I am employed by United Parcel Service, Inc. ("UPS") as a Manager, Health & Safety. I have held this position since March 2018 and have worked for UPS for approximately 28 years.  In my role as a Manager, Health & Safety, I was involved in the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor's inspection of UPS's worksite located at 15994 S. Dupont Highway, Harrington, Delaware 19952.  The following is based on my personal knowledge and review of information available to me in that capacity.

1

2.      UPS is a multinational shipping, receiving, and supply chain management company, which was founded in 1907.

3.      UPS finds purpose in moving the world forward by delivering what matters.  In all UPS does, it is driven by an unwavering commitment to its values. Those values guide how UPS proudly provides best-in-class service to millions of customers, how it takes care of its employees, and how it helps communities around the world.

4.      UPS prides itself on the efficiency with which it delivers packages and, more importantly, guarantees its customers that packages they send via UPS Next Day Air will be delivered the next day by morning, noon, or end of day, depending on the customer's needs.

5.      UPS drivers who operate our "brown trucks" or "package cars" actually operate "commercial motor vehicles," as defined by Federal Motor Carrier Safety Administration ("FMCSA") regulations.

6.      As a result, UPS drivers are subject to various FMCSA regulations that relate to their occupational safety and health.

7.      UPS identifies some of those FMCSA regulations in the Complaint it filed in this Action. OSHA also provides "an overview of the major sections of the [FMCSA] regulations related to driver safety and health" on its website.

https://www.osha.gov/trucking-industry/other-federal-agencies (last visited Sept. 8, 2024).

8.      If I knew that a UPS driver was suffering from heat stress or heat stroke, I would be required by UPS's procedures and policies to ensure that the driver no longer operated their commercial motor vehicle and that they obtained the appropriate care to address their symptoms.

9.      UPS's core values include: (1) excellence; (2) inclusion and belonging; (3) innovation; (4) integrity; (5) service; (6) sustainability; (7) teamwork; and, most pertinent to this matter, (8) safety and wellness.

10.     UPS is laser-focused on keeping employees safe on the road and inside facilities and has been since the time I was hired.

11.     At UPS, nothing is more important than the safety and well-being of its people and the communities it serves.

12.     UPS has invested more than $409 million annually on safety training in the U.S. and its operations employees completed more than seven million hours of safety training in 2023 alone.

13.     UPS also collaborated with MIT, Virginia Tech, and the Institute for the Future to build a high-tech, next-generation training program called UPS Integrad. These eleven driver training centers use virtual and augmented reality along with traditional classroom instruction. Trainees get hands-on experience as

Docusign Envelope ID: D2233AEA-5968-4C83-B1BB-37AA4E50E1D

they navigate the streets of a replica city with simulated commercial and residential delivery and pickup sites.

14.     In 2023, 10,434 UPS drivers around the world had driven for the company for 25 years or longer without an accident, which is about 15 billion miles without so much as a fender-bender.  Drivers with this impeccable safety record wear the UPS Circle of Honor patch proudly on their sleeve.

15.     UPS has received some of its best safety ideas from its employees. Working closely with the Teamsters, UPS created an innovative safety committee platform known as the Comprehensive Health & Safety Process (CHSP) where union-represented employees work hand in hand with management to conduct facility and equipment audits, recommend work process changes and provide safety compliance training.  There are more than 3,200 CHSP committees in UPS facilities globally and more than 2,700 in the U.S.

16.     UPS is also very focused on protecting its employees to be prepared to work in the heat.

17.     While coming to work well rested and staying hydrated are some of the most important ways to keep safe in hot weather, UPS recognizes that these are only part of the safety solution.  UPS believes that the right training, the right processes, and the right equipment are also key to helping UPS employees stay safe.

Docusign Envelope ID: D2233AEA-5968-4C83-B1BB-37AA4E50E1D

18.    UPS recently worked with top experts in heat safety to study various working conditions and further improve its training and protocols to help its employees work safely—especially on hot days.

19.    UPS implemented the Recharge program this summer to provide even more protection from the heat.

20.    Recharge is a new health and safety program developed in partnership with experts in athletic hydration and heat-safety from the Gatorade Sports Science Institute and the Korey Stringer Institute at the University of Connecticut.  UPS also partnered with MISSION®, a major activewear company that specializes in cooling fabrics.  These scientists have decades of experience studying the impact of heat on the human body, and UPS incorporated their expertise into its annual heat awareness training, taking heat-safety science from the sports world and bringing it to UPS.

21.    UPS equipped its delivery drivers with new cooling sleeves and hats—developed in partnership with MISSION®—bringing athletic innovations off the playing field and court and into its operations.

22.    Studies show that cooling key parts of the body can help significantly reduce the risk of overheating, and MISSION®'s state-of-the-art technology helps its cooling fabrics stay up to 30 degrees cooler than body temperature.  The gear was featured on NBC's Today Show during a segment on summer must-haves.

23.    UPS provided more than 440,000 pieces of specialized cooling gear for its drivers and inside staff and has more gear available as needed.

24.    UPS also equipped over 76,000 delivery vehicles with exhaust heat shields that can reduce the vehicle floor temperature by up to 17 degrees F.

25.    Additionally, UPS equipped over 74,000 vehicles with air scoop induction technology to feed fresh air to the cargo bay, providing additional cooling comfort to our drivers.

26.    UPS also completed installation of over 200,000 fans across its package cars.

27.    Following guidance from its heat experts, UPS increased access to ice, cool water, and electrolytes beverages in its facilities to ensure all UPS employees have what they need to stay hydrated.

28.    In June 2023, UPS also reached an agreement with the Teamsters on new heat safety measures that build on the important actions UPS rolled out to employees in the spring of 2023.

29.    In addition to the actions designed to protect UPS drivers from high temperatures outlined above, the contract with the Teamsters included an agreement to equip all newly purchased U.S. small package delivery vehicles with air conditioning starting January 1, 2024.  Where possible, new vehicles will be allocated to the hottest parts of the country first.

30.     Safety is baked into UPS culture.  Always has been; always will be.

31.     On or about July 18, 2024, OSHA opened an inspection regarding UPS's Harrington, Delaware facility.

32.     Based upon representations made to UPS by OSHA, it opened the inspection because it received a report that alleged employees based out of the Harrington, Delaware facility were exposed to high temperatures and suffered heat-related illness.

33.     On July 18, 2024, an OSHA Compliance Officer arrived at UPS's Harrington, Delaware facility.

34.     Until the Compliance Officer informed UPS that it wanted to conduct temperature readings while its drivers were operating their commercial motor vehicles on public roads, UPS fully cooperated with the Compliance Officer and allowed him to physically inspect the Harrington, Delaware facility.

35.     To be clear, UPS only objected to the portion of OSHA's inspection where it sought to inspect the working conditions for its vehicles while they were in operation on the road and not, for example, monitoring the temperature of vehicles while they were being loaded or unloaded at the Harrington, Delaware facility.

Docusign Envelope ID: B2233AEA-5969-4C83-B1BB-37AA4E50E1D

36.     On or about August 1, 2024 and August 7, 2024, UPS reiterated its objection to OSHA conducting temperature readings while its drivers were operating their commercial motor vehicles on public roads.

37.     Based upon documents that I reviewed, OSHA obtained an administrative Warrant for Inspection issued by the United States District Court for the District of Delaware on August 29, 2024 in Case No. 24-294M by Magistrate Judge Christopher Burke (the "Inspection Warrant").

38.     OSHA sought to enforce the Inspection Warrant at the Harrington, Delaware facility on September 5, 2024. At the time, UPS still refused to allow OSHA to enforce the Inspection Warrant for the following reasons.

39.     First, and speaking on behalf of UPS, the company has serious safety concerns with introducing new people and equipment on its trucks, which are moving at high speeds on public roadways.

40.     I have not received from OSHA any validated job hazard analysis ("JHA") showing either that: (1) the introduction of the QUESTemp 34 area heat stress monitors in UPS's commercial motor vehicles; or, (2) the revised processes that a UPS driver would have to perform to allow OSHA Compliance Officers to take readings of those monitors would not pose an undue hazard to our drivers. In other words, OSHA has yet to establish that introducing a new piece of equipment (the QUESTemp 34 area heat stress monitor) and requiring UPS drivers to follow a

different process when completing their tasks would not create an unnecessary safety risk.

41.    Because OSHA has not provided a valid JHA or otherwise established the safety of how it seeks to impact UPS's operations, UPS has yet to determine whether the Federal Motor Carrier Safety Act regulations would even permit the monitoring equipment proposed by OSHA to be installed on its commercial motor vehicles—whether the proposed equipment and process poses a safety hazard for its drivers and all others on or near the roads on which they operate.

42.    If the proposed temperature monitoring equipment would decrease the safety of operation of UPS's trucks, Federal Motor Carrier Safety Act regulations prohibit its use.

43.    Given that safety is at the heart of what we do at UPS, the company is unwilling to risk its drivers' safety without a validated JHA or other form of proof that neither OSHA's proposed temperature monitoring equipment nor the change to our drivers' processes would decrease the safety of operation of UPS's trucks or otherwise create an undue safety risk.

44.    Conducting a JHA regarding both the introduction of the QUESTemp 34 area heat stress monitor into UPS's package cars as well as the change to UPS's drivers' routines would impose a substantial burden on the company.

45.     As an initial matter, UPS would need to determine where the
QUESTemp 34 area heat stress monitor could even be placed within our package
cars so that it would not detrimentally impact the safe operation of the vehicle. As
described below, and based upon the information available to us now, UPS does
not believe that the heat stress monitor could be installed in its package cars safely
and in accordance with the manufacturer's instructions.

46.     UPS has designed its package cars and operations with a focus on
efficiency and minimizing its drivers' movements.  For example, a package car's
cargo area has shelves that are divided into eight equal sections. When our
employees load a package car, they place packages in the same sequence as they
will be delivered.  In other words, the 1000-section packages are generally
delivered first, then the 2000-section packages delivered second, and so on. The
delivery for the first stop in each section should be closest to the front of the

package car. Pictures from UPS's "Service Provider Delivery and Pickup

Methods" that show the cargo area are below:

 

As these pictures show, the size of a package can also impact where that package

will be positioned in the cargo area, smaller packages generally are placed on the

shelves and larger packages on the floor. Other factors, such as the deadline to

deliver a package, may impact where the package is placed inside the cargo area.

47.    We instruct our employees to stack packages tightly on the shelves

and the floor. Specifically, we train them to fit the packages tightly onto one

another as they go across the row, selecting the best spot to utilize all available

space and eliminating possible slipping of packages as they travel. We also train

our employees to use smaller packages to fill in voids.

48.    A fully packed package car would have little, if any, room in the

cargo area to secure the QUESTemp 34 area heat stress monitor. And if it were

placed anywhere in the cargo area, it would disrupt our drivers' movements in that

Docusign Envelope ID: D2333AEA-596B-4C83-B1DB-377AA4E50F1D

area of the package car or prevent us from fully utilizing the cargo area. In fact, to provide adequate space for that equipment in the cargo area, we likely would need to remove packages from a package car or otherwise reorganize our delivery routes and pickups.

49.     Likewise, the QUESTemp 34 area heat stress monitor could not be placed in the cab of the package car without violating UPS's safety rules.  We expressly prohibit drivers from using the cab area for temporary storage because it could hinder their driving and, if they're storing packages there temporarily, damage the packages.

50.     As a result of UPS's prohibition against temporarily storing items in the cab of our package cars, coupled with how the company packs the cargo area of those vehicles, UPS does not believe the QUESTemp 34 area heat stress monitor could be secured within a package car while adhering to the manufacturer's instructions about its use. For the QUESTemp 34 area heat stress monitor, the manufacturer recommends that the monitor be mounted at 3.5 feet or 2 feet high, and recommends tripod mounting "to get the unit away from anything that might block radiant heat or air flow."  The relevant portion from that manual is below.

**Placement for Monitoring/Testing**

The QUESTemp® 34 & 36 model should be placed at a height of 3.5 feet (1.1m) for standing individuals or 2 feet (.6m) for seated individuals.  Tripod mounting is recommended to get the unit away from anything that might block radiant heat or air flow. A 1/4"x 20 threaded bushing on the bottom of the instrument allows mounting to a standard photographic tripod.  Do not stand close to the unit during sampling.

☑ **NOTE:** *Before measuring, allow 10 mins. for the sensors readings to stabilize.*

That amount of space does not exist within a fully packed UPS package car's cargo area.

51.    Determining where the QUESTemp 34 area heat stress monitor should be placed within a UPS package car is only the first hurdle in conducting a risk assessment.  If the parties could somehow agree on where the QUESTemp 34 area heat stress monitor could be placed in a package car that would not cause an obvious hazard, performing the remainder of the JHA would impose a substantial burden on UPS.

52.    When performing a JHA, OSHA instructs employers to analyze all steps of the job and, in order to do so, an employer should:

> Watch several different workers do the work activity, including special procedures that are not part of the normal routine. Break it into a series of smaller steps, until you have a list of all the steps from start to finish. . . . Consult with workers to ensure the list of steps you identified is accurate and representative of how the job is done. Check with multiple workers—you might be surprised by how different one person's description of a job is from another's.

*See* Exhibit 1, "Identifying Hazard Control Options: Job Hazard Analysis," also available at https://www.osha.gov/sites/default/files/

Job_Hazard_Analysis_Worksheet.pdf (last visited Nov. 21, 2024). After

analyzing all the steps of the job, an employer should next "identify [and

describe] the hazards that could occur before a job begins and at each step in

the job." *Id.* Then an employer is to "select, install, maintain, and review

controls." For that, OSHA states an employer should:

> Consider how to change the job step(s) to eliminate the hazard.
> If the job step(s) can't be changed, determine how to protect
> workers from the hazard. Using the hierarchy of controls, select
> the control (or combination of controls) that will most effectively
> prevent the hazard from causing an injury. Once controls are
> identified and installed, review each control with workers, have
> the workers attempt the job step(s) with the new controls in place,
> and gather their feedback. Continue to monitor job performance
> and workers' safety after implementing controls (e.g., make sure
> workers are not trying to bypass controls to do their work faster).

*Id.*

53. To be clear, OSHA's own guidance states that UPS should not rely on

any prior JHA that it conducted related to its drivers' duties. OSHA's advises

employers that:

> before changing operations, workstations, or workflow; making
> major organizational changes; or introducing new equipment,
> materials, or processes, seek the input of workers and evaluate
> the planned changes for potential hazards and related risk.

https://www.osha.gov/sites/default/files/publications/OSHA3885.pdf    (last

visited Nov. 21, 2024).

54.    As the above guidance shows, to properly perform the JHA, UPS would first need to understand all the numerous ways the introduction of the QUESTemp 34 area heat stress monitor into its package cars, as well as OSHA's intermittent monitoring of those devices throughout the day, would alter our drivers' duties. Even understanding that impact would take a significant amount of time and effort.

For example, how would the driver know when to stay with the vehicle so the OSHA compliance officer could enter it? For obvious reasons, we prohibit drivers from leaving the bulkhead door or the rear door open while the package car is unattended. Accordingly, a driver would need to stay on the package car until the compliance officer took the temperature readings and exited the vehicle so the driver could secure it before completing the delivery.  How will that occur? Where will the OSHA Compliance Officer enter the package car? Where in the package car should the driver be during that time?

A multitude of other logistical issues related to the heat stress monitoring would need to be decided before UPS could even complete a JHA, including the following.  How will the driver and OSHA compliance officer communicate with each other throughout the day?  How will the driver know at what stops the OSHA compliance officer will want to check the readings of the device? Will that occur at the beginning of a stop or before the driver leaves for the next stop? How much

additional time will be needed at each stop for the OSHA compliance officer to check the device? Where will each one park at the various stops along the route to ensure the safety of the driver, the OSHA Compliance Officer, and members of the public, while also disrupting traffic as little as possible? Will the OSHA Compliance Officer take the same breaks as the UPS driver?

55.    UPS's serious concerns about how OSHA's proposed temperature monitoring will impact the safety of its drivers stem in part from the inherent dangers associated with having two vehicles, as opposed to one, interact with each other throughout the day on public roadways.  OSHA notes that "transportation incidents and workers struck by vehicles or mobile equipment account for the highest number of fatal work injuries, according to the Bureau of Labor Statistics" and workers "in areas where there are moving vehicles and traffic are exposed to being struck-by moving vehicles." *See* https://www.osha.gov/sites/default/files/publications/work_zone_traffic_safety.pdf (last visited Nov. 21, 2024). While UPS has provided extensive training and guidance to its drivers on how to mitigate that hazard, to date it has not considered how that risk changes by adding an OSHA Compliance Officer tailing the package car in their own vehicle the entire day. UPS also has not determined what controls would be needed to mitigate that additional risk to an acceptable level.

56.    At bottom, a team of UPS employees would likely need to dedicate a day or more to properly perform a JHA to evaluate the risk associated with both the introduction of the QUESTemp 34 area heat stress monitor into UPS's package cars as well as the change to UPS's drivers' routines due to interacting with an OSHA Compliance Officer throughout the day.

57.    Speaking again on behalf of the company, UPS has serious concerns that it would meet all the guarantees that it makes to its customers, or arrive on time to customers' pickups, if a Compliance Officer accesses one of its commercial motor vehicles even before a route begins to set up the QUESTemp 34 area heat stress monitor and then also repeatedly throughout the day during a driver's route to record temperature readings.

58.    Our competitive environment requires that we continue to provide quality service to every pickup and delivery customer, while keeping our cost of doing business under control. Our skilled drivers help us meet these goals, and they have mastered the techniques for safely completing their jobs with minimal physical effort, while maintaining service commitments.

59.    That being said, disruptions to a UPS's driver's day can jeopardize our service commitments to our customers. For example, in our "Service Provider Delivery and Pickup Methods" manual, we note that a driver simply "not being on time" for their shift can threaten meeting those service commitments. To help

ensure we provide the best customer experience by delivering and picking up packages on time, we train drivers on how to complete their duties in the most efficient manner and teach them how to eliminate or minimize any delays that they might encounter on their routes.

60.    Given the regimented nature of a UPS driver's day, coupled with the limited information we have regarding how OSHA would conduct the temperature monitoring, we strongly suspect that, if OSHA enforced the Inspection Warrant, we would need to alter our operations to ensure that we met all our customers' expectations and the guarantees we made those customers.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

November 22, 2024
_____
Date

Signed by:
*Tammy Wilson*
5D09794B27F84B2...
_____
Tammy Wilson

# EXHIBIT 1

# Identifying Hazard Control Options:
# Job Hazard Analysis

## Why Conduct a Job Hazard Analysis (JHA)?

A critical element of any effective safety and health program is a proactive, ongoing process to identify and assess hazards and hazardous situations in both commonly performed jobs and non-routine jobs (those performed infrequently or outside the workers' normal duties). A job hazard analysis (JHA), sometimes referred to as a job safety analysis, helps you identify and control unrecognized hazards, as well as hazards that might emerge when a new process or piece of equipment is introduced. Some OSHA standards require a JHA, including the Bloodborne Pathogens and Personal Protective Equipment (PPE) standards, but many are used by employers voluntarily as part of their safety and health program.

> A job hazard analysis is an exercise in identifying what can go wrong during a job. Your goal is to discover the following:
>
> - What are the potential consequences and worst case scenarios?
> - How could an incident happen?
> - What are other contributing factors?
> - How likely is it that an incident will occur?
> - How can the hazard(s) be controlled?

It's important that you build and train a team of workers and supervisors with diverse expertise and experiences to complete your JHAs. Bring in outside expertise from individuals or organizations if you need to, such as industry associations, insurance carriers, and OSHA's On-Site Consultation Program.

For hazards that pose an immediate danger to an employee's life or health, employers must take immediate action to protect the worker. A JHA can be a first step.

## What Are the Steps to Prepare for a JHA?

Before conducting a JHA, create a plan:

- Gather your team
- Identify jobs that are candidates for JHAs
- Decide how you will record the results of the JHA
- Establish the process to follow up and address the hazards identified in the JHA

## Create a Plan for Your JHA[1]

There are many ways to complete a JHA. Below is a sample JHA plan that could be used in your workplace:

---

[1] This publication does not alter or determine compliance responsibilities which are set forth in OSHA standards and the OSH Act.

# 1. Select and prioritize jobs to analyze

Start with either a job that frequently results in injuries or one where the potential injury could be severe. Ask workers which jobs are the most dangerous, review injury and illness records, and draw on previous work you've done to improve safety and health and prioritize hazards. Consider jobs that are new to your operation or have undergone changes in processes, procedures, or where new employees are working.

# 2. Analyze all steps of the job

Watch several different workers do the work activity, including special procedures that are not part of the normal routine. Break it into a series of smaller steps, until you have a list of all the steps from start to finish. You can reduce any worker concerns about this observation by clearly communicating to workers that this exercise is to help identify potential hazards and make the job safer, not to evaluate their performance. Taking photos or video may help break the job into steps. Consult with workers to ensure the list of steps you identified is accurate and representative of how the job is done. Check with multiple workers—you might be surprised by how different one person's description of a job is from another's.

# 3. Look at each step of the job for hazards

Identify the hazards that could occur before a job begins and at each step in the job. Think about previous injuries/illnesses, what could happen if things go wrong (possible injuries/illnesses), and the worst-case scenarios (that might result in a fatality or serious injury/illness). Common types of hazards to look for include:

- Slips, trips, and falls
- Impacts (struck-by)
- Mechanical (caught on, in, crushed, severe laceration, or amputation)
- Possible migration of material(s) to areas outside of the immediate work area
- Vibration and noise
- Toxic chemicals (inhaled, splashed to eyes, skin contact)
- Heat/temperature
- Flammability or explosive
- Pressurized vessels (tanks, piping)
- Electrical contact
- Ergonomic (lifting, pulling, twisting)
- Combustible dust (sugar, grain, aluminum)

# 4. Describe the hazards

Your hazard description should include:

- Where the operation occurs (the environment)?
- Who or what does it affect (the exposure)?
- What causes the hazard (the trigger)?
- What could happen (the consequence)?
- Any other contributing factors?

Docusign Envelope ID: D2833AEA-596B-4C82-B1B8-377AA4E50F1D

## 5. Select, install, maintain, and review controls

Consider how to change the job step(s) to eliminate the hazard. If the job step(s) can't be changed, determine how to protect workers from the hazard. Using the hierarchy of controls, select the control (or combination of controls) that will most effectively prevent the hazard from causing an injury.[2] Once controls are identified and installed, review each control with workers, have the workers attempt the job step(s) with the new controls in place, and gather their feedback. Continue to monitor job performance and workers' safety after implementing controls (e.g., make sure workers are not trying to bypass controls to do their work faster).

## 6. Review your job hazard analysis

It is important to review your JHA when there is a change in the job or if an injury or Illness occurs on a specific job. Periodically review your JHAs to ensure they are still accurate and continue to identify hazards that were not identified in the initial analysis.

For more information, see OSHA's Job Hazard Analysis (OSHA 3071, 2002, revised):

https://www.osha.gov/sites/default/files/publications/osha3071.pdf

Below is an example description of hazards that could be found in a bakery. On the following pages are a completed and blank JHA template that you can use. It is important to note that work environments may differ and that the example provided below may not be representative of your specific work area(s). Additionally, the completed template is not meant to be a complete list of hazards and controls. An employer could bring in an outside professional to evaluate and recommend additional controls.

### Example description of hazards in a bakery

Date: _____     Evaluator: _____

**Observing machine loading in the dough making process:**

Loading flour into mixers: Using a manual pallet jack (manual forklift), employee #1 transports a pallet of 40-pound flour bags from the storage area to the mixing area (*environment*), drops the pallet, and returns to the storage area with the pallet jack. Employee #2 (*exposure*) manually lifts (*trigger*) each flour bag from the pallet (one at a time) and pours them into a mixing machine (*trigger*), generating a visible plume of dust that comes in contact with Employee #2's skin and can trigger dermatitis (*consequence*). Employee #2 begins coughing after inhaling the flour dust (*consequence*). It takes 15 minutes to load 6 bags of flour into the mixing machine. Employee #2 complains about back pain (*consequence*).

After emptying each bag of flour, Employee #2 places the empty bags by their feet (trigger), creating a tripping hazard (consequence), because they can't access the large trash receptacle. It was found that where the pallet had been positioned for unloading the bags of flour, access to the large trash receptacle was blocked (*contributing factor*). Employee #2 creates an additional step when they pick up the empty bags and place them in the receptacle (*trigger*), which creates another plume of dust (*consequence*). Employee #2 is again exposed to inhaling the dust and having large amounts of loose flour stick to their skin.

---

[2] OSHA's Hierarchy of Controls worksheet (PDF) can be found on OSHA's website at:
https://www.osha.gov/sites/default/files/Hierarchy_of_Controls_02.01.23_form_508_2.pdf.

# Job Hazard Analysis Form

| **Location:** Grocery Store | **Department:** Bakery | **Job:** Baker |
|---|---|---|
| **Shift:** Morning | **Date:** | **Job Classification:** Associate Staff |

**Operation/Job Process:** Dough Making

**Assessment Members:** Safety Team, Bakery Manager, Union Representative

| # | Steps | Hazards | Examples of Controls |
|---|---|---|---|
| 1 | Employee #2 manually lifts 40-lb flour bags, one at a time, from pallet unassisted. | • Repetitive motion and stress on lower back (ergonomic) | • Adjustable lift table<br>• Two-person lifts<br>• Frequent breaks |
| 2 | Employee #2 pours the flour bags into mixing machines. | • Process generates dust around mixer opening and Employee #2's breathing zone (inhalation)<br>• Dust cakes on exposed skin (contact)<br>• Pinch points for loose hair and clothing | • Lid for mixer<br>• Local exhaust ventilation system<br>• Appropriate respirator protection<br>• Long sleeve clothing (tight fitting)<br>• Gloves<br>• Remove any accumulations of dust |
| 3 | Employee #2 drops empty bag on the floor for removal later. | • Tripping hazard and<br>• Additional dust exposure when bags are removed (housekeeping, etc.) | • Waste container near worker<br>• Reposition process so pallet is near mixer and not blocking path to waste receptacle<br>• Routine housekeeping inspection |

# Job Hazard Analysis Form

| Location: | Department: | Job: |
|---|---|---|
| Shift: | Date: | Job Classification: |
| Operation/Job Process: | | |
| Assessment Members: | | |

| # | Steps | Hazards | Examples of Controls |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Docusign Envelope ID: D2233AEA-596B-4C82-B1B9-277AA4F50F3B

# Sign-off

Is the above information up to date and accurate?

## Worker

☐ **Yes**    ☐ **No**

**Name** _____    **Date** _____

## Manager

☐ **Yes**    ☐ **No**

**Name** _____    **Date** _____

## Supervisor

☐ **Yes**    ☐ **No**

**Name** _____    **Date** _____