IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED PARCEL SERVICE, INC.,  )<br>  )<br>  *Plaintiff*,  )<br>  )<br>  v.  )<br>  )<br>OCCUPATIONAL SAFETY AND  )<br>HEALTH ADMINISTRATION;  )<br>U.S. DEPARTMENT OF LABOR;  )<br>and JULIE A. SU, in her official  )<br>capacity as Acting Secretary of  )<br>Labor,  )<br>  )<br>  *Defendants*.  )<br>  ) | C.A. No. 1:24-cv-01036-CFC |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT
OF UNDISPUTED FACTS**

The Occupational Safety and Health Administration, United States Department of Labor, and Julie A. Su, in her official capacity as Acting Secretary of Labor ("Defendants") respectfully submit this response to United Parcel Service, Inc.'s ("UPS") concise statement of undisputed facts in support of its motion for summary judgment (D.I. 22).

    1.    United Parcel Service Inc. ('UPS") is a multinational shipping, receiving, and supply chain management company. *See* Exhibit A, Declaration of Tammy Wilson in Support of Plaintiff United Parcel Service, Inc.'s Motion for Summary Judgment ("Wilson Decl.") ¶ 2.

**Defendants' Response:** Undisputed.

2.     UPS operates through various worksites, including those located at: (1) 15994 S. Dupont Highway, Harrington, Delaware 19952; (2) 721 Hamburg Road, New Castle, Delaware 19720; and (3) 300 Redbud Blvd., McKinney, Texas 75069.  *See* Exhibit B, Declaration of Brandon J. Brigham in Support of Plaintiff United Parcel Service, Inc.'s Motion for Summary Judgment ("Brigham Decl.") ¶¶ 2-4.

**Defendants' Response:**  Undisputed, except that the correct address for the relevant worksite in Texas is 300<u>0</u> Redbud Blvd., McKinney, Texas 75069.

3.     Each of those worksites was the target of an Inspection Warrant.  *Id.*

**Defendants' Response:**  Undisputed.

4.     When UPS drivers perform their duties and deliver packages, they are operating "commercial motor vehicles" as defined by Federal Motor Carrier Safety Administration ("FMCSA") regulations.  Wilson Decl. ¶ 5.

**Defendants' Response:**  This paragraph contains a legal conclusion. Defendants do not dispute that the specific UPS trucks on which it sought to conduct heat monitoring are "commercial motor vehicles" subject to FMCSA regulations.

5.     UPS has dedicated significant resources to ensure its employees remain safe.  For example, UPS has invested more than $409 million annually on safety training in the United States, and its operations employees completed more than seven million hours of safety training in 2023 alone. Wilson Decl. ¶ 12.

**Defendants' Response:**  Undisputed upon information and belief.

6.     UPS is also very focused on protecting its employees from heat. *Id.* ¶ 16. This summer, for example, UPS introduced Recharge, a new health and safety program developed in partnership with experts in athletic hydration and heat safety from the Gatorade Sports Science Institute and the Korey Stringer Institute at the University of Connecticut. *Id.* ¶¶ 17-20. UPS also partnered with MISSION®, a major activewear company that specializes in cooling fabrics. *Id.* ¶ 21. As a result, UPS provided more than 440,000 pieces of

2

specialized cooling gear for its drivers and inside staff and has more gear available as needed. *Id.* ¶ 23. UPS also equipped over 76,000 delivery vehicles with exhaust heat shields. *Id.* ¶ 24. Additionally, UPS equipped over 74,000 vehicles with air scoop induction technology, providing additional cooling comfort to its drivers. *Id.* ¶ 25. UPS also completed installation of over 200,000 fans within its package cars. *Id.* ¶ 26.

**Defendants' Response:** Undisputed upon information and belief.

7.     In June 2023, UPS also reached an agreement with the Teamsters on new heat safety measures, including an agreement to equip all newly purchased U.S. small package delivery vehicles with air conditioning starting January 1, 2024. *Id.* ¶ 28-9. Where possible, new vehicles will be allocated to the hottest parts of the country first. *Id.*

**Defendants' Response:** Undisputed.

8.     FMCSA is "the lead federal government agency responsible for regulating and providing safety oversight of commercial motor vehicles (CMVs)[.] FMCSA's mission is to reduce crashes, injuries, and fatalities involving large trucks and buses." *See* www.fmcsa.dot.gov/mission/who (last visited Nov. 18, 2024). In carrying out its safety mandate, FMCSA:

- Develops and enforces data-driven regulations that balance motor carrier (truck and bus companies) safety with efficiency;
- Harnesses safety information systems to focus on higher risk carriers in enforcing the safety regulations;
- Targets educational messages to carriers, commercial drivers, and the public; and
- Partners with stakeholders including Federal, State, and local enforcement agencies, the motor carrier industry, safety groups, and organized labor on efforts to reduce bus and truck-related crashes.

https://www.fmcsa.dot.gov/mission (last visited Nov. 18, 2024).

**Defendants' Response:** Undisputed.

9.     OSHA provides "an overview of the major sections of the [FMCSA] regulations related to driver safety and health" on its website.

https://www.osha.gov/trucking-industry/other-federal-agencies (last visited Nov. 21, 2024).

**Defendants' Response:** Undisputed.

10. As set forth on its website, "OSHA's mission is to assure America's workers have safe and healthful working conditions free from unlawful retaliation. OSHA carries out its mission by setting and enforcing standards; enforcing antiretaliation provisions of the OSH Act and other federal whistleblower laws; providing and supporting training, outreach, education, and assistance; and ensuring state OSHA programs are at least as effective as federal OSHA, furthering a national system of worker safety and health protections." www.osha.gov/aboutosha (last visited Nov. 21, 2024).

**Defendants' Response:** Undisputed.

11. On its website, OSHA also notes that:

- "OSHA regulations govern the safety and health of the workers and the responsibilities of employers to ensure their safety at the warehouse, dock, construction site, and in other places truckers go to deliver and pick up loads throughout the country." https://www.osha.gov/trucking-industry (last visited Nov. 21, 2024).

- "OSHA has authority over off-highway loading and unloading, such as warehouses, plants, grain handling facilities, retail locations, marine terminals, wharves, piers, and shipyards." https://www.osha.gov/trucking-industry/loading-unloading (last visited Nov. 21, 2024).

**Defendants' Response:** Undisputed.

12. On July 30, 2024, OSHA opened an inspection regarding UPS's McKinney, Texas facility. Brigham Decl. ¶ 2, Ex. 1.

**Defendants' Response:** Undisputed.

13. On July 15, 2024, OSHA opened an inspection regarding UPS's New Castle, Delaware location. Brigham Decl. ¶ 3, Ex. 2.

**Defendants' Response:** Undisputed.

14.   On July 18, 2024, OSHA opened an inspection regarding UPS's Harrington, Delaware facility. Brigham Decl. ¶ 4, Ex. 3.

**Defendants' Response:** Undisputed.

15.   In each inspection, UPS objected when OSHA sought to inspect the working conditions of its vehicles while they were in operation on the road by installing temperature monitoring devices. *Id.* ¶¶ 5, 7, 9, Exs. 4, 6, 8. As a result, OSHA obtained an Inspection Warrant in each of the three inspections. *Id.* ¶¶ 6, 8, 10, Exs. 5, 7, 9.

**Defendants' Response:** Undisputed.

16.   OSHA sought to enforce an Inspection Warrant at the Harrington, Delaware facility on September 5, 2024. *Id.* ¶ 11.

**Defendants' Response:** Undisputed.

17.   OSHA sought to enforce an Inspection Warrant at the McKinney, Texas facility on September 17, 2024. *Id.* ¶ 12.

**Defendants' Response:** Undisputed.

18.   Both times, UPS reiterated its objection to OSHA conducting temperature readings while its drivers were operating their commercial motor vehicles on public roads. *Id.* ¶ 11, Exs. 10 & 11.[1]

**Defendants' Response:** Undisputed.

20.   To date, OSHA has not provided any assurances to UPS that it will not obtain or seek to enforce an Inspection Warrant in the future. *Id.* ¶ 16.

---

[1] Plaintiff's Concise Statement of Undisputed Facts (D.I. 22) skips paragraph numbers 19, 21, and 22. Thus, the paragraph numbers in this Response to Plaintiff's Concise Statement of Undisputed Facts likewise skip those paragraphs in order to match Plaintiff's numbering and avoid confusion.

**Defendants' Response:**  Disputed in part.  Defendants do not dispute that OSHA has not assured UPS that it will never seek to obtain and enforce another warrant seeking to conduct heat monitoring in UPS package trucks at some point in the future if new facts arose that would establish administrative probable cause.  In its Notice of Voluntary Dismissal, however, Plaintiff conceded that there is no risk of OSHA seeking to obtain another warrant to conduct heat monitoring in UPS package trucks "until temperatures rise in the Spring."  (D.I. 17).

> 23.  UPS's refusal to allow OSHA to conduct the search of its commercial motor vehicles was partially based on its safety concerns with introducing new people and equipment on its trucks. Wilson Decl. ¶ 39.

**Defendants' Response:**  Disputed in part.  Defendants do not dispute that UPS raised purported safety concerns as a basis for refusing to comply with the federal warrants.  On September 6, 2024, in response to those concerns, OSHA's counsel informed UPS's counsel that "[m]onitoring inside of vehicles has been conducted [by OSHA] multiple times this year and last with no issues." D.I. 22-2 at 61.  Defendants respectfully refer the Court to the relevant email correspondence for a full, complete, and accurate statement of its contents, *see* D.I. 22-2 at 52-66, and dispute any characterization inconsistent with its contents.  Defendants further deny any suggestion by UPS that OSHA and UPS could not work together to install the monitoring equipment in a manner that eliminates UPS's supposed safety concerns.

> 24.  OSHA did not present it with any validated job hazard analysis showing that either (1) the introduction of the QUESTemp 34 area heat stress

monitors in UPS's commercial motor vehicles or (2) the revised processes that a UPS driver would have to perform to allow OSHA Compliance Officers to take readings of those monitors would not pose an undue hazard to its drivers. *Id.* ¶ 40.

**Defendants' Response:** Disputed in part. Defendants do not dispute that OSHA did not present UPS with a validated job hazard analysis. Defendants dispute that OSHA had any obligation to do so prior to conducting monitoring pursuant to a warrant. On September 6, 2024, OSHA's counsel informed UPS's counsel that "[m]onitoring inside of vehicles has been conducted [by OSHA] multiple times this year and last with no issues." D.I. 22-2 at 61. Defendants respectfully refer the Court to the relevant email correspondence for a full, complete, and accurate statement of its contents. *See* D.I. 22-2 at 52-66.

25. As a result, UPS has yet to determine whether FMCSA regulations would permit the monitoring equipment proposed by OSHA to be installed on its commercial motor vehicles. *Id.* ¶ 41.

**Defendants' Response:** Disputed in part. Defendants do not dispute that UPS has "yet to determine" whether any FMSCA regulations would be contravened by the monitoring equipment that OSHA sought to install on UPS package trucks. Defendants dispute that UPS's failure to make that determination was the result of any actions by OSHA.

26. Conducting a JHA regarding both the introduction of the QUESTemp 34 area heat stress monitor into UPS's package cars as well as the change to UPS's drivers' routines would impose a substantial burden on the company. *Id.* ¶¶ 44-56.

7

**Defendants' Response:** Defendants dispute that conducting such a JHA—which UPS estimates would take "a day or more," *see* Wilson Decl. ¶ 56—or causing drivers to change their routines would impose a substantial burden on UPS.

27. UPS also has serious concerns that it might not meet the guarantees that it makes to its customers if a Compliance Officer accesses one of its commercial motor vehicles even before a route begins to set up the QUESTemp 34 area heat stress monitor and then also repeatedly throughout the day during a driver's route to record temperature readings. *Id.* ¶¶ 57-60.

**Defendants' Response:** Undisputed upon information and belief.

          Respectfully submitted,

          DAVID C. WEISS
          UNITED STATES ATTORNEY

          */s/ William E. LaRosa*
          William E. LaRosa
          Assistant United States Attorney
          United States Attorney's Office
          1313 N. Market Street
          Wilmington, DE 19899-2046

Dated: December 18, 2024          *Attorney for the Defendants*

## Certification of Counsel Regarding Font and Word Count

Counsel for the United States of America certifies that this filing complies with the type, font, and word limitations set forth in the Court's November 10, 2022 Standing Order. The font is Times New Roman, 14-point, and the word count as provided by the word-processing system is 1,791 words.

*/s/ William E. LaRosa*
William E. LaRosa
Assistant United States Attorney
